## SCHULENBERG ET AL. *v.* HARRIMAN.

1. On the 3d of June, 1856, Congress passed an act entitled "An act grant-
ing public lands to the State of Wisconsin to aid in the construction of
railroads in said State." That act grants to the State for the purpose
of aiding in the construction of a railroad between certain specified
points every alternate section of land, designated by an odd number, for
six sections in width on each side of the road. The language of the first
section of the act is, "*that there be, and is hereby, granted* to the State
of Wisconsin," the lands specified. The third section declares "that
the said lands *hereby granted* to said State shall be subject to *the disposal*
of the legislature thereof;" and the fourth section provides in what
manner sales shall be made, and enacts that if the road be not com-
pleted within ten years, "no further sales shall be made, and the lands
unsold shall *revert* to the United States." The State accepted the grant
thus made, and assumed the execution of the trust. The route of the
road was surveyed, and a map of its location was filed in the land office
at Washington. The adjoining odd sections within the prescribed
limits were then withdrawn from sale by the proper officers of the gov-
ernment and certified lists thereof, approved by the Secretary of the In-
terior, were delivered to the State. Subsequently, on the 5th of May,
1864, Congress passed another act on the same subject, entitled "An act
granting lands to aid in the construction of certain railroads in the State
of Wisconsin." By its first section additional land is granted to the
State upon the same terms and conditions as those contained in the pre-
'vious act, for the purpose of aiding in the construction of the road be-
tween certain of the points designated in the act of 1856, and the last
act extends the time for completing the road for five years. This road
has never been constructed, nor any part of it, and the time for its con-
struction has not been extended since the act of 1864. Nor has Congress
passed any act, nor have any judicial proceedings been taken to enforce
a forfeiture of the grants for failure to construct the road within the
period prescribed. *Held:*
    1st. That the act of June 3d, 1856, and the first section of the act of May
    5th, 1864, are grants *in presenti,* and passed the title to the odd sections
    designated to be afterwards located; when the route was fixed their
    location became certain, and the title, which was previously imperfect,
    acquired precision and became attached to the land;
    2d. That the lands granted have not reverted to the United States, although
    the road was not constructed within the period prescribed, no action
    having been taken either by legislation or judicial proceedings to en-
    force a forfeiture of the grants.
2. Unless there are clauses in a statute restraining the operation of words of
present grant, these must be taken in their natural sense to import an
immediate transfer of title, although subsequent proceedings may be

required to give precision to that title and attach it to specific tracts. No individual can call in question the validity of the proceedings by which precision is thus given to the title where the United States are satisfied with them.

3. The provision in the act of 1856 that all lands remaining unsold after ten years shall revert to the United States, if the road be not then completed, is a condition subsequent, being in effect a provision that the grant to the extent of the lands unsold shall be void if the work designated be not done within that period.

4. No one can take advantage of the non-performance of a condition subsequent annexed to an estate in fee, but the grantor or his heirs or successors, and if they do not see fit to assert their right to enforce a forfeiture on that ground, the title remains unimpaired in the grantee. The rule equally obtains where the grant upon condition proceeds from the government.

5. The manner in which the reserved right of the grantor for breach of the condition must be asserted so as to restore the estate depends upon the character of the grant. If it be a private grant, that right must be asserted by entry, or its equivalent. If the grant be a public one, the right must be asserted by judicial proceedings authorized by law, or there must be some legislative assertion of ownership of the property for breach of the condition, such as an act directing the possession and appropriation of the property, or that it be offered for sale or settlement.

6. Where the title to land remains in the State, timber cut upon the land belongs to the State. Whilst the timber is standing it constitutes a part of the realty; being severed from the soil its character is changed; it becomes personalty, but its title is not affected; it continues as previously the property of the owner of the land, and can be pursued wherever it is carried. All the remedies are open to the owner which the law affords in other cases of the wrongful removal or conversion of personal property.

7. Where logs cut from the lands of the State without license have been intermingled with logs cut from other lands, so as not to be distinguishable, the State is entitled, under the law of Minnesota, to replevy an equal amount from the whole mass. The remedy afforded by the law of Minnesota in such case held to be just in its operation and less severe than that which the common law would authorize.

8. Where, in an action of replevin, the complaint alleges property and right of possession in the plaintiffs, and the answer traverses directly these allegations, under the issue thus formed any evidence is admissible on the part of the defendant which goes to show that the plaintiffs have neither property nor right of possession. Evidence of title in a stranger is admissible.

ERROR to the Circuit Court for the District of Minnesota.

Schulenberg and others brought replevin against Harriman for the possession of certain personal property, consist-

ing of over sixteen hundred thousand feet of pine saw-logs, claimed by them, and alleged to be unlawfully detained from them by the defendant. The logs thus claimed were cut on

lands embraced in an act of Congress approved June 3d, 1856, entitled "An act granting public lands to the State of Wisconsin to aid in the construction of railroads in said State."* That act declares in its first section "that there be, *and is hereby, granted* to the State of Wisconsin, for the purpose of aiding in the construction of a railroad from Madison or Columbus by the way of Portage City to the St. Croix River or lake, between townships twenty-five and thirty-one, and from thence to the west end of Lake Superior and to Bayfield, . . . every alternate section of land designated by odd numbers for six sections in width, on each side of the road," . . . and "that the land *hereby granted* shall

---

* 11 Stat. at Large, 20.

be exclusively applied in the construction of the railroad for which it is granted and selected, and to no other purpose whatsoever." . . . In its third section the act provides "that the said lands *hereby granted* to said State shall be subject *to the disposal* of the legislature thereof for the purposes aforesaid and no other." And in its fourth section, that the lands "shall be disposed of by said State only in the manner following, that is to say, a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of road, may be sold; and when the governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of said road are completed, then another like quantity of land hereby granted may be sold, and so on from time to time until said road is completed, *and if said road is not completed within ten years no further sales shall be made, and the lands unsold shall revert to the United States.*"

The State of Wisconsin, by act of its legislature, accepted the grant thus made, and assumed the execution of the trust. The route of the road was surveyed, and a map of its location was filed in the land office at Washington. The adjoining odd sections within the prescribed limits were then withdrawn from sale by the proper officers of the government, and certified lists thereof, approved by the Secretary of the Interior, were delivered to the State.

Subsequently, on the 5th of May, 1864, Congress passed another act on the same subject, entitled "An act granting lands to aid in the construction of certain railroads in the State of Wisconsin."* By its first section additional land was granted to the State upon the same terms and conditions contained in the previous act, for the purpose of aiding in the construction of a railroad from a point on the St. Croix River or lake, between townships twenty-five and thirty-one, to the west end of Lake Superior, and from some point on the line of said railroad, to be selected by the State, to Bayfield, and the time for the completion of the road, as

---

* 13 Stat. at Large, 66.

mentioned in the previous act, was extended for the period of five years from the passage of the last act. The State, through its legislature, accepted this grant also.

There were also some other grants made by the act for other railroads.

The road here mentioned, and which is a part of the road designated in the act of 1856, has never been constructed, nor has any part of it been constructed, and Congress has not passed any act since 1864 extending the time for its construction. Nor has Congress passed any act, nor have any judicial proceedings been taken by any branch of the government to enforce a forfeiture of the grants for failure to construct the road within the period prescribed.

The complaint in the case alleged property and right of possession in the plaintiffs. The answer among other matters traversed these allegations.

It was stipulated by the parties that the plaintiffs were in the quiet and peaceable possession of the logs at the time of their seizure by the defendant, and that such possession should be conclusive evidence of title in the plaintiffs against evidence of title in a stranger, unless the defendant should connect himself with such title by agency or authority in himself, and that the seizure of the property by the defendant was, so far as the manner of making the same was concerned, valid and legal in all respects, as though made under and by virtue of legal process, the evident object of the stipulation being to test the right of the parties to the property independent of the manner of its seizure.

By an act of the legislature of Wisconsin of March 3d, 1869, the governor of the State was authorized to appoint competent persons as agents of the State, whose duty it was. made to preserve and protect the timber growing upon the lands granted by the acts of Congress, and to take into possession on behalf of the State any logs and timber which might be cut on or carried away from those premises without lawful authority, wherever the same might be.

The evidence showed that defendant was appointed agent of the State under this act, and that as such agent he seized

the logs for which the present action was brought; that the logs were, during the years 1870 and 1871, floated from the places where they were cut down the river St. Croix into a boom at Stillwater, in the State of Minnesota, and were there intermingled with other logs of similar character and marks belonging to the plaintiffs, so that the particular logs cut on the lands granted to the State could not be distinguished from logs cut on other lands; that the boom from which the defendant seized the logs in suit was two and a half miles long, and from one to three-fourths of a mile wide, and contained about three hundred millions of feet of pine logs; that the defendant before the seizure demanded of the plaintiffs the logs cut on the lands granted, and the plaintiffs refused to deliver them.

The defendant contended in support of the seizure and of his right to the possession of the property—

1st. That the act of Congress of June 3d, 1856, and the first section of the act of May 5th, 1864, passed the legal title to the lands designated therein to the State of Wisconsin in trust for the construction of the railroad mentioned.

2d. That the lands designated have not reverted to the United States, although the road was not constructed within the period prescribed, no judicial proceedings nor any act on the part of the government having been taken to forfeit the grants.

3d. That the legal title to the lands being in the State, it was the owner of the logs cut thereon, and could authorize the defendant as its agent to take possession of them wherever found; and,

4th. That under the law of Minnesota, the plaintiffs having mingled the logs cut by them on the lands of the State with other logs belonging to them, so that the two classes could not be distinguished, the defendant had a right, after demand upon the plaintiffs, to take from the mass a quantity of logs equal to those which were cut on the lands of the State.

The plaintiffs controverted these several positions, and contended besides that under the stipulation of the parties and the pleadings in the case, no proof of title in the State

was admissible; and that if the acts of Congress vested a title in the State that title was transferred by the nineteenth section of an act of its legislature, passed March 10th, 1869, to the St. Croix and Superior Railroad Company, a corporation then created for the purpose of constructing the railroads designated in those acts. That section was as follows:

"For the purpose of aiding in the construction of the railway hereby incorporated, the State of Wisconsin hereby transfers unto said company all the rights, title, interest, and estate, legal or equitable, now owned by the State in the lands heretofore conditionally granted to the St. Croix and Superior Railroad Company, for the construction of a railroad and branches; and . . . does further grant, transfer, and convey unto the said railway company . . . the possession, right, title, interest, and estate which the said State of Wisconsin may now have or shall hereafter acquire of, in, or to any lands, through gift, grant, or transfer from the United States, or by any act of. the Congress of the United States, amending 'An act granting a portion of the public lands to the State of Wisconsin to aid in the construction of a railroad, approved June 3d, 1856,' and the act or acts amendatory thereof, or by any future acts of the Congress of the United States granting lands to the State of Wisconsin, so far as the same may apply to, and in the construction of, a railroad from Bayfield, in the county of Bayfield, in a southwesterly direction, to the intersection of the main line of the Northern Wisconsin Railway, from the lake or river St. Croix to Superior, to have and to hold such lands, and the use, possession, and fee in the same, upon the express condition to construct the herein described railway within the several terms and spaces of time set forth and specified in the next preceding section of this act;. *and upon the construction and completion of every twenty miles of said railway the said company shall acquire the fee simple absolute in and to all that portion of lands granted to this State in any of the ways hereinbefore described by the Congress of the United States, appertaining to that portion of the railway so constructed and completed.*"

The following provisions of law are in force in Minnesota, and were in force when the logs in suit were seized by the defendant:

"SECTION 2. In cases where logs or timber bearing the same mark, but belonging to different owners in severalty, have, without fault of any of them, become so intermingled that the particular or identical logs or timber belonging to each cannot be designated, either of such owners may, upon a failure of any one of them, having possession, to make a just division thereof, after demand, bring and maintain against such one in possession an action to recover his proportionate share of said logs or timber, and in such action he may claim and have the immediate delivery of such quantity of said logs or timber as shall equal his said share, in like manner and with like force and effect as though such quantity embraced his identical logs and timber and no other." *

The court below being of opinion in favor of the defendant, on the different points raised, he obtained judgment that he recover possession of the property which had been replevied from him after his seizure of the same, or the sum of $16,809, their value and costs. To reverse this judgment the plaintiffs brought the case here on writ of error.

*Mr. E. C. Palmer, for the plaintiff in error:*

I. *Under the pleadings and stipulation evidence of title in the State was inadmissible.*†

When the defendant in replevin claims a return of the property replevied, he occupies, as to his own title or claim, the position of a plaintiff.‡ His answer, therefore, should set up the same facts substantially which would be required in a complaint.

II. *The court below improperly held that the legal-title to the lands embraced in the acts of Congress of June 3d, 1856, and May 5th, 1864, still remained in the State of Wisconsin.*

1. The acts of Congress did not constitute a grant *in pre-*

---

* Chapter 59, General Laws of Minnesota, approved March 1st, 1865.

† Anstice *v* Holmes, 3 Denio, 244; Harrison *v.* McIntosh, 1 Johnson, 380; Rogers *v.* Arnold, 12 Wendell, 30; Prosser et al. *v.* Woodward, 21 Id. 205; 3 Chitty's Pleadings, 1044, title "Replevin;" General Statutes of Minnesota, ch. 66, §§ 79, 113; Coit *v.* Waples et al., 1 Minnesota, 134; Finley *v.* Quirk, 9 Id. 194.

‡ General Statutes of Minnesota, ch. 66, title viii, and sec. 119.

*senti.* The State acquired under them only a permissive right to dispose of said lands, for a defined purpose, upon complying with certain conditions named in the acts, and acquired no title *of any degree* in the lands. It was not upon the theory that this proposed road was a State need that this appropriation of the national resources was made, but upon the theory that it was a national need. It is true the State of Wisconsin was interested in the results of the improvement, but the national policy of making internal improvements would forbid her to assert that she was more than the local agent of the Federal government in carrying out the object of this appropriation. The purpose and end of the grant do not require the construction that the State takes the legal title *in presenti,* by virtue of the acts. It must be presumed that Congress in passing the acts considered that the general good would be best subserved by such application of a portion of the public lands, and so made provisions, through the agency of the States and their representatives, the railroad companies, to dispense, as the improvements go on, the fund provided to further such object.

2. It is a general rule that all public grants are to be construed strictly and in favor of the public, and that nothing passes but what is granted in clear and explicit terms.*

3. That the acts of Congress were not *per se* a grant *in presenti* to the State of all the lands therein described, and that a present right, estate, and interest in the same, did not pass by the terms of the acts, is settled by the case in this court of *Rice* v. *Railroad Company.*† There the matter is considered in the interpretation of the grant made by Congress on the 29th of June, 1854, to the Territory of Minnesota; a grant, so far as the present question is concerned, identical with this one.

---

* Rice v Railroad Company, 1 Black, 380; Mills et al. *v.* St. Clair County, 8 Howard, 581; Richmond Railroad *v.* The Louisa Railroad, 13 Id. 81; Commonwealth *v.* The Erie, &c , Railroad Co., 27 Pennsylvania State, 339; Dubuque, &c., Railroad *v.* Litchfield, 23 Howard, 66–88; United States *v.* Arredondo, 6 Peters, 691.

† 1 Black, 376.

III. *If the title passed to the State by the said acts, such title reverted to the United States, no part of the road having been built at the expiration of the period limited in the grant.*[*]

Here was a grant or appropriation of part of the public domain for a defined purpose upon condition that such purpose should be accomplished within a time limited. It was founded upon no consideration unless the road in aid of which the appropriation was made should be built. The lands could not be sold until certain defined portions of the road should be constructed and due proof thereof made to the Secretary of the Interior. At the expiration of the time limited, all lands not patented were to revert to the United States.

The court below held that such lands did not *ipso facto* revert to the United States by mere failure to build the road within the period prescribed by the act of Congress; and that to effect the forfeiture some act on the part of the General government evincing an intention to take advantage of such failure is essential.

This position is met in *Rice* v. *Railroad Company,* already cited. The court there says:

" Neither of the sections . . . contain any words which necessarily and absolutely vest in the Territory any beneficial interest in the thing granted. Undoubtedly the words employed are sufficient to have that effect, and if not limited or restricted by the context or other parts of the act, they would properly receive that construction, but the word grant is not a technical word, like the word *enfeoff,* and although if used broadly without limitation or restriction, it would carry an estate or interest in the thing granted, still it may be used in a more restricted sense, and be so limited that the grantee will take but a mere naked trust or power to dispose of the thing granted and to apply the proceeds arising out of it to the use and benefit of the grantor."

---

[*] Rice *v.* Railroad Co., 1 Black, 381; United States *v.* Wiggins, 14 Peters, 334; Buyck *v* United States, 15 Id 215; O'Hara et al. *v.* United States, Ib. 275; Glenn *v.* United States, 13 Howard, 250; Kennedy et al. *v.* Heirs of McCartney, 4 Porter, 141.

Indeed, public policy demands that the government should not be required to take any step in order to place lands embraced in such public acts, as are now under consideration, in their former condition, at the precise time provided in the act. To require a judicial declaration of forfeiture would clog the free disposition of the public lands, which the government ought at all times to be able to exercise in furtherance of the public interests. And it is not clear how or where such proceeding could be instituted, or who would be necessary parties thereto. An act of Congress, or an order of the Land Department, or Secretary of the Interior, could not conclude any one or divest title previously vested.

The rule as sometimes applied to private grants rests upon the principle that such grants carry the fee of the land, and the right of actual occupancy for such purposes as the grantee desires to effect, subject however to certain conditions, which, if unperformed, may operate as a defeasance, provided the grantor shall re-enter for condition broken; that the title or interest of the grantee is an estate which can be incumbered or transferred by deed, like other real property, and cannot be diverted except by judicial proceedings instituted for that purpose.

Under the act of 1864 no land could be sold until twenty miles were constructed, and then only those sections which were coterminous with the constructed line, not by the State, but by the companies. No road can be constructed after ten years under the first act, nor after five years from May 5th, 1864, under the second. Under this act the State possesses no disposing power over the lands by sale or conveyance. Unless, therefore, the State can create or designate certain railroad corporations to receive the grant, there can occur no contingency in which the State would have any duty to perform or any right or power in the premises. Such case, irrespective of the question of legal title, bears no analogy to a private grant, where the estate and power of the grantee are as ample, in the beginning and until re-entry or forfeiture judicially declared, as if the grant contained no conditions whatever.

IV. *If the State acquired title by the acts of Congress, that title passed under the legislation of the State, in 1869, to a corporation incorporated to construct the roads.*

The nineteenth section of the act of March 10th, 1869, (quoted *supra*, p. 50), was a present grant of the interest of the State. The State after this had no power to protect the land from trespassers or to seize the timber cut.

V. *The defendant could not lawfully seize the logs in controversy, because they could not be identified as the logs cut on the lands of the State.*

The statute of Minnesota has no relation to the action of replevin, and cannot avail the defendant herein, whatever effect it would have upon the measure of damages in an action of trover. At common law the rule is without exception in replevin that the property must be identified, or the action will not lie.

*Messrs. I. C. Sloan, B. J. Stevens, and J. C. Spooner, contra:*

I. Under the *pleadings* it was competent for the defendant to prove title in a stranger, and in that way to defeat the plaintiffs.[*] Such proof went directly to meet a material allegation of the plaintiffs. Proving title in the State of Wisconsin, "a stranger" would, indeed, under the *stipulation*, have been insufficient; but when after proving the acceptance by the State of the grants, sufficient evidence was given that the defendant had been the agent of the State for the preservation and protection of the timber growing on the lands embraced in the grants, and that he had authority to so protect them; that his seizure and possession of the logs in controversy were as such agent, and under the authority given him by the State of Wisconsin, pursuant to its laws, it "connected the defendant with such title by competent evidence of authority or agency in himself." The evidence was thus competent under the pleadings, material to the issues, strictly proper in itself, and in literal fulfilment of the stipulation.

---

[*] Dermott v. Wallach, 1 Black, 96.

II. That the acts of Congress vested an estate *in presenti,* is proved by *Rutherford.v. Greene's Heirs,\** *Lessieur* v. *Price,†* and by other cases.‡

In *Rice* v. *Railroad Company,* the act which it was said made the grant, unlike the act of 1856, which made the grant here, in terms provided *that the title should not vest until* the road, or portions thereof, were built. That grant was repealed by Congress before any disposition of it *became operative,* and it was held by a majority of this court that the act vested in the Territory "a mere naked trust or power to dispose of the lands in the manner therein specified," and until the power was in fact executed was the subject of repeal, but that if the clause providing that the title should not vest, &c., had been omitted, it would have been similar to the grant considered in *Lessieur* v. *Price,* and been "*a present grant.*" The case is plainly distinguishable from ours, and in fact accords with the judgment below.

III. It is argued in effect that the words in the act, "shall revert to the United States," were intended as a declaration of forfeiture in advance. But until forfeiture has been incurred, it is not competent for the legislature to declare it; because the legislature cannot know in advance whether or not it may not wish to waive the forfeiture. The words are merely definitive of the condition, for the non-performance of which the legislature may thereafter declare a forfeiture, and are to be construed in connection with the whole act, and in the light of the objects to be accomplished thereby.

In the case of *United States* v. *Repentigny,§* the corresponding words were, "and that in default thereof, the same *shall* be reunited to his Majesty's domain;" words equally imperative with those of the act in question, and yet they were held not to be a declaration of forfeiture, but as definitive of the condition merely.

---

\* 2 Wheaton, 196. † 12 Howard, 59.

‡ United States *v.* Percheman, 7 Peters, 51; Mitchel *v.* United States, 9 Id. 711; United States *v.* Brooks, 10 Howard, 442; Ladiga *v.* Roland, 2 Id. 581.

§ 5 Wallace, 267.

Even where the condition provides that the estate shall be *void* on non-performance, the estate is not defeated without some act or declaration of the grantor.* This is one of the most ancient principles of the common law assumed as settled in cases reported as far back as Leonard, Sir Francis Moore, Plowden, Coke, and Croke,† vouching the Year Books, and affirmed by many modern decisions.‡ In the case of an individual it is by entry; in the case of the government by office found.

As Congress is the grantor in the case at bar, and has sole authority to dispose of the public domain by grant, Congress alone can declare the intention to enforce the forfeiture. As held by the court in *United States* v. *Repentigny; supra*, an act of Congress is an equivalent for office found. The election to waive the forfeiture or to enforce it rests with Congress. It is a question of intention; and no department of the government, either the executive or judicial, can know what the pleasure of Congress may be, and cannot, therefore, treat the title to the lands as revested until Congress has declared its intention in that regard.

This court will take judicial notice of the proceedings of Congress, and, therefore, we refer to the facts that on two or more occasions Congress has refused to declare and enforce the forfeiture of the grant in question; that bills having passed the House were rejected in the Senate, showing an

---

* Sneed *v.* Ward, 5 Dana, 187; Cross *v.* Coleman, 6 Dana, 446.

†. Sir Moyle Finch's Case, 2 Leonard, 143; Same Case, Moore, 296; Willion *v.* Berkley, 1 Plowden, 229; Sir George Reynel's Case, 9 Reports, 96, *b*; Parslow *v.* Corn, Croke Eliz. 855.

‡ Railroad Company *v.* Smith, 9 Wallace, 95; Hornsby *v.* United States, 10 Id. 224; Marwick *v.* Andrews, 25 Maine, 525; Guild *v.* Richards, 16 Gray, 309; United States *v.* Repentigny, 5 Wallace, 267; Fairfax's Devisee *v.* Hunter's Lessee, 7 Cranch, 631; Smith *v.* Maryland, 6 Id. 286; Little *v.* Watson, 32 Maine, 214; People *v.* Brown, 1 Caines's Reports, 416; Nicoll *v.* New York and Erie Railroad Co., 12 New York, 121; Osgood *v.* Abbott, 58 Maine, 73; Sneed *v.* Ward, 5 Dana, 187; Cross *v.* Coleman, 6 Id. 446; Towle *v.* Smith, 2 Robertson's New York, 489; Duncan *v.* Beard, 5 South Carolina (2 Nott & McCord), 405; Wilbur *v.* Tobey, 16 Pickering, 177; Thompson *v.* Bright, 1 Cushing, 428; Fremont *v.* United States, 17 Howard, 560.

intention on the part of Congress to waive a forfeiture, if one has in fact been incurred.

We may also refer to the fact that more than two-thirds of the line of railroad authorized by the act of June 3d, 1856, has been constructed is recognized and shown by various acts of Congress.

Conditions subsequent are not favored in law, and are construed strictly.*

IV. The act of the legislature of Wisconsin of March 10th, 1869, did not transfer the title to the lands from the State to the railroad company in the way alleged by opposing counsel.

1. The State could only dispose of the lands in the manner provided by the act of Congress of June 3d, 1856, that is, as fast as the railroad was constructed. It was thus a trustee, with power of disposal limited by the act creating the trust.

2. The concluding terms of section nineteen (italicized *supra*, p. 50), are to be construed with that earlier portion of the section (which might be sufficient in form to convey a present title) and modifies and limits its operation. The specific declaration as to the time when the title in fee should vest, is equivalent to a provision that the fee shall not vest except as the road is constructed.†

V. The last point made by opposing counsel is answered by the statute of Minnesota, whose words are too plain to be misconstrued.

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court, as follows:

The position of the plaintiffs, that under the stipulation of the parties and the pleadings no proof of title in the State to the logs in controversy was admissible, cannot be sustained. The complaint alleges property and right of pos-

---

\* United States *v.* Repentigny., 5 Wallace, 267; Emerson *v.* Simpson, 43 New Hampshire, 475; Hooper *v.* Cummings, 45 Maine, 359.

† Rice *v.* Railroad, 1 Black, 358.

session in the plaintiffs; the answer traverses directly these allegations, and under the issue thus formed any evidence was admissible on the part of the defendant which went to show that the plaintiffs had neither property nor right of possession. Evidence of title in the State would meet directly the averment, upon proof of which the plaintiffs could alone recover; and the stipulation was evidently framed upon the supposition that title in the State—for there was no other stranger—would be offered, and it provided for the inconclusiveness of the evidence against the possession of the plaintiffs unless the defendant connected himself with that title. The admitted quiet and peaceable possession of the property by the plaintiffs at the time of the seizure was *primâ facie* evidence of title, and threw the burden upon the defendant of establishing the contrary.

The position that if the acts of Congress vested in the State a title to the lands designated, that title was transferred by the act of its legislature, passed March 10th, 1869, is equally untenable. The State by the terms of the grants from Congress possessed no authority to dispose of the lands beyond one hundred and twenty sections, except as the road, in aid of which the grants were made, was constructed. The company named in the act never constructed any portion of such road, and there is no evidence that the State ever exercised the power to sell the one hundred and twenty sections authorized in advance of such construction. The acts of Congress made it a condition precedent to the conveyance by the State of any other lands, that the road should be constructed in sections of not less than twenty consecutive miles each. No conveyance in violation of the terms of those acts, the road not having been constructed, could pass any title to the company.

Besides, it is evident, notwithstanding the words of transfer to the company contained in the first part of the nineteenth section of the act of the State, that it was not the intention of the State that the title should pass except upon the construction of the road. Its concluding language is that " upon the construction and completion of every twenty

miles of said railway the said company shall acquire the fee simple absolute in and to all that portion of the land granted" to the State appertaining to the portion of the railway so constructed and completed.

We proceed, therefore, to the consideration of the several grounds upon which the defendant justifies his seizure of the logs in controversy, and claims a return of them to him.

1. That the act of Congress of June 3d, 1856, passed a present interest in the lands designated there can be no doubt. The language used imports a present grant and admits of no other meaning. The language of the first section is, " *that there be, and is hereby, granted* to the State of Wisconsin" the lands specified. The third section declares "that the said lands *hereby granted* to said State shall be subject to *the disposal* of the legislature thereof;" and the fourth section provides in what manner sales shall be made, and enacts that if the road be not completed within ten years " no further sales shall be made, and the lands unsold shall *revert* to the United States." The power of disposal and the provision for the lands reverting both imply what the first section in terms declares, that a grant is made, that is, that the title is transferred to the State. It is true that the route of the railroad, for the construction of which the grant was made, was yet to be designated, and until such designation the title did not attach to any specific tracts of land. The title passed to the sections, to be afterwards located; when the route was fixed their location became certain, and the title, which was previously imperfect, acquired precision and became attached to the land.

In the case of *Rutherford* v. *Greene's Heirs*, reported in the second of Wheaton, a similar construction was given by this court to an act of North Carolina, passed in 1782, which provided that twenty-five thousand acres of land should be allotted and given to General Greene and his heirs within the limits of a tract reserved for the use of the army, to be laid off by commissioners appointed for that purpose. The commissioners pursuant to the directions of the act allotted the twenty-five thousand acres and caused the quantity to be

surveyed and the survey to be returned to the proper office, and the questions raised in the case related to the validity of the title of General Greene, and the date at which it commenced. The court held that the general gift of twenty-five thousand acres lying in the territory reserved became by the survey a particular gift of the quantity contained in the survey, and concluded an extended examination of the title by stating that it was the clear and unanimous opinion of the court, that the act of 1782 vested a title in General Greene to the twenty-five thousand acres to be laid off within the bounds designated, and that the survey made in pursuance of the act gave precision to that title and attached it to the land surveyed.

On the 6th of March, 1820, Congress passed an act for the admission of Missouri into the Union, and among other regulations to aid the new State, enacted, " that four entire sections of land be and the same are hereby granted to said State for the purpose of fixing the seat of government thereon, which said sections shall, under the direction of the legislature of said State, be located as near as may be in one body, at any time, in such townships and ranges as the legislature aforesaid may select, on any of the public lands of the United States." In *Lessieur* v. *Price*, reported in the twelfth of Howard, the operation of this act was considered; and the court said :

" The land was granted by the act of 1820; it was a present grant, wanting identity to make it perfect; and the legislature was vested with full power to select and locate the land; and we need only here say, what was substantially said by this court in the case of *Rutherford* v. *Greene's Heirs*, that the act of 1820 vested a title in the State of Missouri of four sections; and that the selection made by the State legislature pursuant to the act of Congress, and the notice given of such location to the surveyor-general and the register of the local district where the land lay, gave precision to the title, and attached to it the land selected. The United States assented to this mode of proceeding; nor can an individual call it in question."

Numerous other decisions might be cited to the same purport. They establish the conclusion that unless there are other clauses in a statute restraining the operation of words of present grant, these must be taken in their natural sense to import an immediate transfer of title, although subsequent proceedings may be required to give precision to that title and attach it to specific tracts. No individual can call in question the validity of the proceedings by which precision is thus given to the title where the United States are satisfied with them.

The rules applicable to private transactions, which regard grants of future application—of lands to be afterwards designated—as mere contracts to convey, and not as actual conveyances, are founded upon the common law, which requires the possibility of present identification of property to the validity of its transfer. A legislative grant operates as a law as well as a transfer of the property, and has such force as the intent of the legislature requires.

The case of *Rice* v. *Railroad Company*, reported in the first of Black, does not conflict with these views. The words of present grant in the first section of the act there under consideration were restrained by a provision in a subsequent section declaring that the title should not vest in the Territory of Minnesota until the road or portions of it were built.

The grant of additional land by the first section of the act of Congress of 1864 is similar in its language and is subject to the same terms and conditions as the grant by the act of 1856. With the other grants, made by the act of 1864, we are not concerned in the present case.

2. The provision in the act of Congress of 1856, that all lands remaining unsold after ten years shall revert to the United States, if the road be not then completed, is no more than a provision that the grant shall be void if a condition subsequent be not performed. In Sheppard's Touchstone it is said: " If the words in the close or conclusion of a condition be thus: that the land shall return to the enfeoffor, &c., or that he shall take it again and turn it to his own profit, or *that the land shall revert,* or that the feoffor shall

*recipere* the land, these are, either of them, good words in a condition to give a re-entry—as good as the word ' re-enter' —and by these words the estate will be made conditional."*
The prohibition against further sales, if the road be not completed within the period prescribed, adds nothing to the force of the provision. A cessation of sales in that event is implied in the condition that the lands shall then revert; if the condition be not enforced the power to sell continues as before its breach, limited only by the objects of the grant, and the manner of sale prescribed in the act.

And it is settled law that no one can take advantage of the non-performance of a condition subsequent annexed to an estate in fee, but the grantor or his heirs, or the successors of the grantor if the grant proceed from an artificial person; and if they do not see fit to assert their right to enforce a forfeiture on that ground, the title remains unimpaired in the grantee. The authorities on this point, with hardly an exception, are all one way from the Year Books down. And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the conditions annexed.†

In what manner the reserved right of the grantor for breach of the condition must be asserted so as to restore the estate depends upon the character of the grant. If it be a private grant, that right must be asserted by entry or its equivalent. If the grant be a public one it must be asserted by judicial proceedings authorized by law, the equivalent of an inquest of office at common law, finding the fact of forfeiture and adjudging the restoration of the estate on that ground, or there must be some legislative assertion of ownership of the property for breach of the condition, such

---

* Sheppard's Touchstone, 125.

† Sheppard's Touchstone, 149; Nicoll *v.* New York and Erie Railroad Co., 12 New York, 121; People *v.* Brown, 1 Caines's Reports, 416; United States *v.* Repentigny, 5 Wallace, 267; Dewey *v.* Williams, 40 New Hampshire, 222; Hooper *v.* Cummings, 45 Maine, 359; Southard *v.* Central Railroad Co., 2 Dutcher, 13.

as an act directing the possession and appropriation of the property, or that it be offered for sale or settlement. At common law the sovereign could not make an entry in person, and, therefore, an office-found was necessary to determine the estate, but, as said by this court in a late case, "the mode of asserting or of resuming the forfeited grant is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly under the authority of the government without these preliminary proceedings."* In the present case no action has been taken either by legislation or judicial proceedings to enforce a forfeiture of the estate granted by the acts of 1856 and 1864. The title remains, therefore, in the State as completely as it existed on the day when the title by location of the route of the railroad acquired precision and became attached to the adjoining alternate sections.

3. The title to the land remaining in the State the lumber cut upon the land belonged to the State. Whilst the timber was standing it constituted a part of the realty; being severed from the soil its character was changed; it became personalty, but its title was not affected; it continued as previously the property of the owner of the land, and could be pursued wherever it was carried. All the remedies were open to the owner which the law affords in other cases of the wrongful removal or conversion of personal property.

4. The logs cut from the lands of the State without license, having been intermingled by the plaintiffs with logs cut from other lands, so as not to be distinguishable, the owner was entitled, under the legislation of Minnesota, and the decisions of her courts, to replevy from the whole mass an amount equal to those cut by the plaintiffs, and the stipulation of the parties provides that the seizure by the defendant, so far as the manner of making the same is concerned, was as valid and legal in all respects as though made under and by virtue of legal process. The remedy thus afforded

---

* United States v. Repentigny, 5 Wallace, 211, 268; and see Finch v. Riseley, Popham, 53.

by the law of Minnesota is eminently just in its operation, and is less severe than that which the common law would authorize.

We perceive no error in the rulings of the court below, and the judgment is, therefore,

AFFIRMED.